# In re GRAND JURY SUBPOENA TO JOHN DOE.

## No. 1:99M0005S.

United States District Court, W.D. Virginia, Abingdon Division.

April 19, 1999.

---

## OPINION

JONES, District Judge.

The question here is whether a grand jury witness may assert a privilege against self-incrimination and thus withhold his testimony from the grand jury concerning his role as a government cooperative in a narcotics investigation. Finding that the information sought by the government was not of an incriminating nature and the possibility of criminal prosecution too remote in any event, I hold that the witness may not stand on his Fifth Amendment privilege and is therefore compelled to testify.

### I. Background.

This matter comes before me on appeal of the magistrate judge's order denying the government's motion to compel testimony of a grand jury witness.[1] The witness, who will be referred to in this opinion as John Doe, was subpoenaed by the government to appear before the grand jury. Doe appeared as compelled but refused to answer any questions or provide any information to the grand jury other than his name; choosing to assert his Fifth Amendment privilege against self-incrimination as provided under the United States Constitution.

1. The matter was referred to the magistrate judge for determination as provided for by 28 U.S.C.A. § 636(b)(1)(A) (West 1993). I may reconsider any pretrial matter so referred "where it has been shown that the magistrate's order is clearly erroneous or contrary to law." *Id.*

Following this assertion of privilege, Doe, unrepresented by counsel, appeared before the magistrate judge, as did counsel for the government. At that time, the government stated its intentions with respect to Doe, specifically that he would be questioned concerning two controlled purchases of cocaine made in cooperation with and under the supervision of law enforcement officials. The government admitted that no formal grant of immunity or non-prosecution agreement had been offered the witness at that time, but added that, as a government cooperative, Doe had not engaged in criminal activity and could, therefore, be compelled to testify as to his non-criminal acts committed in furtherance of the investigation.

For his part, Doe informed the magistrate judge that he intended to assert his Fifth Amendment privilege against self-incrimination in response to any questions asked of him concerning the two controlled drug purchases in question. According to Doe, he feared for the safety of his family, as well as himself. The court subsequently informed Doe that the Fifth Amendment did not provide him with a privilege against testifying based on a fear of reprisal. Doe was also informed of the consequences of his refusal to respond to government questioning should the court find that his assertion of privilege was improper.

Doe was recalled before the grand jury later that day but still refused to answer questions relating to the two controlled drug purchases. Faced with the witness's reassertion of his Fifth Amendment privilege, the government once again came before the magistrate judge, seeking to have Doe's testimony compelled. At this time, the court appointed counsel for Doe, who then testified in support of his Fifth Amendment privilege. The government, in turn, offered the testimony of a local police detective. During the hearing, a tape recording of the grand jury session was played, and the court was able to hear the government attorney's questioning of Doe and his refusal to testify and assertion of the Fifth Amendment. At the close of the evidence, the government requested that the court enter an order ruling that Doe's assertion of his Fifth Amendment privilege was improper and compelling him to answer the questions the government had posed before the grand jury.

In support of its case against Doe, the government then filed a written motion to compel his grand jury testimony. The government noted its belief that Doe could not be prosecuted for the controlled buys in question and, therefore, had no Fifth Amendment right to refuse to testify. To remove any doubt of its intentions in this respect, as well as any potential barriers to the issuance of a compulsion order by the magistrate judge, the government also offered a written nonprosecution representation.

Upon review of the testimony and the tape-recorded grand jury proceedings, the magistrate judge noted in a memorandum opinion that, as a matter of fact, there existed "no dispute that [Doe] would incriminate himself" if he answered the questions posed by the government. (Mem. Op. at 3.) The magistrate judge consequently found that a sufficient grant of immunity was required to compel Doe's testimony before the grand jury. After consideration of the nonprosecution agreement proffered by the government, however, the magistrate judge found that the government's grant failed to provide sufficient protection from criminal prosecution under the relevant immunity doctrines. The court consequently denied the government's motion to compel Doe's testimony, pending a sufficient grant of immunity.

In response to the magistrate judge's order, the government filed a timely appeal and restated its grounds in support of its motion to compel Doe's testimony. A hearing was held before this court, and the issue is now ripe for decision.

## II. Facts.

According to the government, John Doe and representatives of the United States Attorney's office entered into discussions in late 1997 regarding Doe's violation of his state probation term and how he might assist the government in a narcotics investigation. In exchange for Doe's cooperation with law enforcement officials conducting a narcotics investigation, the United States Attorney's office promised to intervene on Doe's behalf concerning his probation violation.

On December 3, 1997, Doe met with certain federal, state, and local law enforcement officers. According to a local police detective, Doe had provided some names of "some big targets ... dealing in narcotics that he could help us get." (Tr. at 15.)[2] Following this meeting, Doe was instructed that he was to act as a government plant or cooperative in a controlled drug purchase which law enforcement would monitor. Officers allegedly met with Doe a second time during which Doe was fitted with a body wire and given $200. Doe allegedly proceeded as directed to meet with the target, who will be referred to in this opinion as Robert Roe, at which time he exchanged the money for cocaine.

This sequence of events was repeated on December 16, 1997, at which point Doe was given $300 and returned from his meeting with Roe with additional cocaine.

A detective monitored the interactions and discussions between Doe and Roe and could not recall anything out of the ordinary occurring. To the detective's knowledge, Doe never deviated from the scope of his prescribed task on either day in question. Moreover, the amounts of cocaine returned by Doe were thought normal considering the amount of cash paid to Roe.

Doe was subpoenaed to testify before the grand jury three months prior to the present occasion concerning his involvement in the controlled drug buys but was unable to appear. According to Doe, he was "working out of town" in North Carolina. (Tr. at 17, 33.) Upon hearing that Doe had violated his probation again and was being detained, the government served Doe a second time with a subpoena to appear before the grand jury.

Doe has indicated that he would have been willing to testify previously but that he now fears for the safety of his family and himself while in jail. According to Doe, his main concern is fear of reprisal from Roe, who has been known to put out "hits on people's families." (Tr. at 30.) Doe also made a vague reference to charges which the government might have against him, as follows: "I was told that I've got federal indictments coming on me from my probation officer, but I don't see how because I've not done anything wrong." (Tr. at 34.)

For the government's part, Doe is seen as "the primary witness" in its case against Roe. (Tr. at 27.)

## III. Analysis.

██ The Fifth Amendment to the United States Constitution states that "[n]o person ... shall be compelled in any criminal case to be a witness against himself...." U.S. Const. amend. V. This language has been interpreted to afford the individual a broad privilege against being compelled to provide information which "the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." *Kastigar v. United States,* 406 U.S. 441, 444–45, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). This privilege may be asserted "in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory," *Kastigar,* 406 U.S. at 444, 92 S.Ct. 1653, including a grand jury proceeding. *See United States v. Penrod,* 609 F.2d 1092, 1095 (4th Cir.1979).

---

**2.** The transcript is of the hearing before the magistrate judge.

In consideration of a witness's Fifth Amendment privilege, the Fourth Circuit has stated the following: "the privilege may not ... be invoked on no more than the mere assertion by one claiming the privilege that information sought by the government may be incriminating. Whether there is a sufficient hazard of incrimination is of course a question for the courts asked to enforce the privilege." *United States v. Sharp*, 920 F.2d 1167, 1170 (4th Cir.1990) (citing *Hoffman v. United States*, 341 U.S. 479, 486, 71 S.Ct. 814, 95 L.Ed. 1118 (1951)). To determine whether there is a sufficient hazard of incrimination, this circuit employs a two-step inquiry: first, the court considers whether the information is incriminating in nature; and second, if the incriminating nature of the information is established, the court asks "whether criminal prosecution is sufficiently a possibility, all things considered, to trigger the need for constitutional protection." *Id.* at 1170–71.

As a practical matter, whether information is incriminating in nature may or may not be apparent on its face. If, in light of the questions asked and the circumstances of their asking, the incriminating potential of the information is facially apparent, then the court moves to the second part of the inquiry. *See id.* at 1170. If the incriminating potential is not facially apparent, however, "the person asserting the privilege may yet demonstrate its incriminating potential by further contextual proof." *Id.*

Determining whether testimony is self-incriminating on its face may appear straightforward, but "[w]hile the concept of potential incrimination encompasses a great deal, it is not without limits." Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 8.10 (1984). To say that something is potentially incriminating is to say that it poses the threat of "criminal liability, and that liability must relate to the witness himself, not others." *Id.* Turning to the rules of evidence for guidance, courts at the federal and state level have analogized the concept of self-incrimination to declarations against penal interest. *See* Fed.R.Evid. 804(b)(3); *see, e.g., United States v. DeVillio*, 983 F.2d 1185, 1189–90 (2d Cir.1993); *Boney v. Commonwealth*, 16 Va.App. 638, 432 S.E.2d 7, 9–11 (Va.App.1993). Under this analysis, an individual's actions are only self-incriminating if they were punishable under applicable criminal law.

The Second Circuit's consideration of the self-incrimination concept in *DeVillio* followed just such an analysis. The court was faced with potentially exculpatory statements made on tape by a co-conspirator who had also agreed to cooperate with the government by wearing a wire during the investigation. *See DeVillio*, 983 F.2d at 1188. In order to examine whether the taped statements were indeed against the declarant's penal interest, the court evaluated the trustworthiness of the declarations under the three-part test set forth in *Chambers v. Mississippi*, 410 U.S. 284, 300–01, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). *See DeVillio*, 983 F.2d at 1190. According to the third prong of the *Chambers* test for trustworthiness, statements are not within the hearsay exception unless they are "*self-incriminating* and unquestionably against the declarant's penal interest" when made. *Id.* (citing *Chambers*, 410 U.S. at 300–01, 93 S.Ct. 1038) (emphasis added). In *DeVillio*, the court found that the statements at issue did not meet this standard: "[a]t that time, Heidel's statement was ... not 'against his penal interest' because he was recording the conversations under the F.B.I.'s supervision and his statements did not 'subject him to criminal liability.'" *Id.*

The *DeVillio* holding is particularly relevant here: first, as mentioned above, it serves as compelling authority that a self-incriminating statement must be one that is against an individual's penal interest at the time it is made and necessarily subjects him to criminal liability; and second, it stands for the proposition that a government cooperative does not subject himself

to criminal liability when acting in congruence with government authorities. *See also United States v. Sadler,* 48 F.3d 1218, No. 94–5132, 1995 WL 82505, at *2 (4th Cir. Feb.22, 1995) (unpublished) (stating that "a paid informant's statements are not against his penal interest" and thus do not qualify under that exception to the hearsay rule) (citations omitted).

In sum, the law provides that statements which confirm the declarant's role as a government cooperative are facially nonincriminating. By their very nature, the actions spoken of cannot expose the declarant to criminal liability so long as he acted under the government's supervision.

It is possible, however, that a case may arise where the agency relationship between the government and an alleged cooperative is in dispute, for example, where a supposed government cooperative acts as a "double agent." In such a case, the witness is afforded a second bite at the apple, i.e., an opportunity to show that a facially non-incriminating statement does, in fact, have incriminating potential. *See Sharp,* 920 F.2d at 1170.

■ Although a statement may be non-incriminating on its face, incriminating potential may still be proved where a witness plausibly contends that the questions asked seek to elicit evidence that might form a link in a chain of reasoning leading to the witness's conviction of a crime. *See Hoffman,* 341 U.S. at 486, 71 S.Ct. 814. Returning to the hypothetical case of the double agent, it is possible that the desired grand jury testimony could form just such a link. For the witness, it is his role as a government cooperative that saves him from being prosecuted initially for what otherwise would be a criminal act. Where contextual proof exists, however, to support a theory that the government cooperative was, unbeknownst to the government at the time, acting as a double agent and thus engaged in criminal activity outside of the supervision of the government, evidence of the acts committed become evidence of criminal activity. What once

were seemingly harmless answers become, in fact, incriminating in nature. Armed with the witness's declaration before the grand jury, the prosecution would only need to establish the witness's double agent status in order to prove that the believed cooperative activity was, in fact, criminal activity.

■ With this legal landscape in mind, I must determine whether the information sought by the government in this case is of an incriminating nature—first, by looking at the nature of the questions asked and the circumstances of their asking, and then, if not thereby facially evident, I must examine any contextual proof that the witness has offered in support of its incriminating potential. Only upon establishing the incriminating nature of the information may I turn to an analysis of the possibility of prosecution.

Considering, first, the questions asked of the witness and the circumstances of their asking, the record reveals the following inquiries made by the government attorney to Doe before the grand jury:

[O]n December 3rd of 1997 what did you do with the crack cocaine after you received it? . . .

On . . . December 16th of 1997 . . . did you meet with law enforcement at that time for the purpose of making a controlled buy from [Robert Roe]? . . .

On December 16th of 1997 did the officers provide you with money for the purchases? . . .

Did you receive the crack cocaine from [Robert Roe] on December 16th of ninety-seven? . . .

On December 16th of 1997 did you make a purchase of crack cocaine on [address redacted]? . . .

On December 16, 1997 did you purchase the crack cocaine from [Robert Roe]? . . .

On December 16th of 1997 did you provide the crack cocaine that you pur-

chased from [Robert Roe] to law enforcement agents? . . . (Tr. at 11–12.) To each of these questions, the witness asserted his Fifth Amendment privilege against self-incrimination.

It is clear from the text of the questions themselves and the circumstances of their asking that the government sought to elicit information confirming Doe's status as a government cooperative in two controlled buys of cocaine. I find, therefore, that the information sought does not on its face expose Doe to criminal liability and is thus not incriminating in nature. As the government stated, no crime was thereby committed which would support a finding of incriminating potential: "[T]he U.S. Attorney's Office arranged through the local law enforcement people that [Doe] could meet with them, and they would set up controlled buys. So, when he made these purchases he was acting on behalf of the Government in making these purchases." (Tr. at 14.) Because such information does not indicate any criminal activity on its face, Doe may not stand on his Fifth Amendment privilege absent further proof of the incriminating nature of the information sought.

The witness has offered insufficient contextual proof, however, in support of the incriminating potential of the information sought by the government. The magistrate judge heard testimony from both Doe and the detective involved in the alleged drug purchases. The court questioned the detective as to the role played by Doe in the investigation. According to the detective, he did not detect any conversations or transactions between Doe and Robert Roe outside of the specified buys during their monitored interactions.

Moreover, the detective indicated that on each occasion Doe delivered cash as requested and brought back cocaine in "proper" amounts—on the first occasion he paid out $200 and brought back 0.5 grams of cocaine, and on the second he paid out $300 and brought back 0.61 grams of cocaine. (Tr. at 22–23.) Finally, when asked by the court whether the detective had "any information, whatsoever . . . that would lead you to believe that Mr. [Doe] deviated out of the scope of what he was asked to do on behalf of the law enforcement agencies he was working with," the detective responded in the negative, stating, "[n]one that I'm aware of." (Tr. at 23.) No indication was given that Doe had acted improperly in any way nor was there any evidence to support a theory that Doe had in some way severed the agency relationship between himself and the law enforcement agencies concerning the events in question.

In her memorandum opinion, the magistrate judge denied the government's motion to compel, having found as a matter of fact that "there is no dispute that [Doe] would incriminate himself if he answered these questions." (Mem. Op. at 3.) The magistrate judge thus concluded that a grant of immunity was required but found that the government's nonprosecution agreement was patently insufficient to replace the Fifth Amendment privilege. Although it promised freedom from prosecution for involvement in the two drug buys, the agreement afforded Doe neither a broad grant of transactional immunity nor a narrower grant of use and derivative use immunity, as would have been minimally sufficient in this case and coextensive with the Fifth Amendment privilege. *See generally Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972); *United States v. Jarvis,* 7 F.3d 404 (4th Cir.1993).[3]

---

**3.** The representation by the government stated as follows:

The United States hereby agrees 'and states that it will not prosecute [John Doe] for making a controlled buy of cocaine from [Robert Roe] on December 3, 1997 between

the hours of 1:00 p.m. and 2:00 p.m. at [address redacted]. In addition, the United States hereby agrees and states that it will not prosecute [John Doe] for making a controlled buy of cocaine from [Robert Roe] on December 16, 1997 between the hours of

On appeal of the magistrate judge's opinion, the government now agrees that its nonprosecution agreement did, in fact, fall short of the standard ascribed to assertions of the privilege against self-incrimination. The government reiterates its position, however, that no grant of immunity need be made in Doe's case. The government contends that the magistrate judge has erred in finding Doe's refusal to testify was based on a fear of self-incrimination and that, in any event, truthful answers to the questions asked would not incriminate Doe.

Returning to Doe's Fifth Amendment claim, I must decide if the witness through contextual proof has substantiated the incriminating nature of information which, on its face, is non-incriminating. In light of the recorded testimony and evidence, I find that Doe has not done so.

■ Clearly, Doe's main concern in refusing to testify is the effect his testimony might have on Robert Roe, the subject of the government's investigation. A fear of reprisal is, of course, not a fear of incrimination and, moreover, does not provide Doe with a privilege against testifying. *See In re Farrell,* 611 F.2d 923, 925 (1st Cir.1979) (citing *United States v. Handler,* 476 F.2d 709 (2d Cir.1973)).

Of course, had Doe established the existence of any real concern of incrimination, my analysis might have been different. But Doe has not even hinted that he might have deviated from the scope of his prescribed activities or otherwise breached the agency relationship between himself and the local and state agents. Nor has any effort been made to elaborate on the feared indictments mentioned by Doe in his hearing before the magistrate judge.

In light of the absence of evidence in support of incriminating potential, I must, therefore, find that the information sought by the government from Doe is not incriminating in nature.

■ Even had Doe established the incriminating nature of the information, however, I still would have had to find that he faced an actual "possibility" of "criminal prosecution." *Sharp,* 920 F.2d at 1171. My determination of whether criminal prosecution is "sufficiently a possibility" to trigger the privilege depends on an assessment of "the objective reasonableness of the target's claimed apprehension of prosecution." *Id.* Under this objective lens, the court generally assumes the reasonableness of a claimed apprehension once incriminating potential is found. *Id.* There are two circumstances, however, where despite a finding of incriminating potential, a witness may not invoke the privilege against self-incrimination because there is not a sufficient possibility of prosecution. First, the privilege may not be invoked "where the testimony could not possibly be used in a prosecution against the witness." *United States v. Goodman,* 289 F.2d 256, 259 (4th Cir.), *vacated and request to require testimony withdrawn,* 368 U.S. 14, 82 S.Ct. 127, 7 L.Ed.2d 75 (1961). For example, prosecution is not possible where there are "genuine questions about the government's legal ability to prosecute." *Sharp,* 920 F.2d at 1171. In other words, the privilege will not be upheld where a prosecution is barred by such legal barriers as the statue of limitations period, the doctrine of double jeopardy, or grants of immunity. *See Belmonte v. Lawson,* 750 F.Supp. 735, 739 (E.D.Va.1990).

■ Second, the privilege will not be upheld "where prosecution would be a

4:30 p.m. and 5:30 p.m. at [address redacted].
(Mem. at 2.) Because this agreement does not offer Doe immunity from the entire substance of the events (i.e., all that his testimony would relate to and not just the controlled buys themselves), it does not qualify as transactional. *See United States v. Harris,* 973 F.2d 333,

336 (4th Cir.1992). It does not qualify as use immunity because it does not prohibit the use of the testimony or any evidence derived therefrom, against the witness as a source of incriminating evidence. *See Jarvis,* 7 F.3d at 414–15; 18 U.S.C.A. § 6002 (West 1985 & Supp.1999).

mere imaginary possibility, remote and improbable." *Goodman*, 289 F.2d at 259. As the Supreme Court has stated, "[t]he constitutional protection against self-incrimination is confined to real danger, and does not extend to remote possibilities out of the ordinary course of law." *Mason v. United States*, 244 U.S. 362, 365, 37 S.Ct. 621, 61 L.Ed. 1198 (1917) (internal citations omitted). Thus, the boundaries for what may constitute a reasonable fear of prosecution are now well established:

> [I]t is only when there is but a fanciful possibility of prosecution that a claim of Fifth Amendment privilege is not well taken.... When a witness can demonstrate any possibility of prosecution which is more than fanciful he has demonstrated a reasonable fear of prosecution sufficient to meet constitutional muster.

*In re Folding Carton Antitrust Litigation*, 609 F.2d 867, 871 (7th Cir.1979) (citations omitted). *See Belmonte v. Lawson*, 750 F.Supp. 735, 739 (E.D.Va.1990).

The rationale for limiting the invocation of the privilege to non-fanciful, non-remote claims is equally straightforward:

> "We think a merely remote and naked possibility, out of the ordinary course of the law and such as no reasonable man would be affected by, should not be suffered to obstruct the administration of justice. The object of the law is to afford to a party, called upon to give evidence in a proceeding *inter alios*, protection against being brought by means of his own evidence within the penalties of the law. But it would be to convert a salutary protection into a means of abuse if it were to be held that a mere imaginary possibility of danger, however remote and improbable, was sufficient to justify the withholding of evidence essential to the ends of justice."

*Goodman*, 289 F.2d at 260 (quoting *Mason*, 244 U.S. at 366, 37 S.Ct. 621).

In this case, assuming arguendo that Doe has proven the incriminating potential of his desired testimony, I find that there is but a fanciful possibility that he would be prosecuted for his actions. Viewing Doe's claim objectively, the possibility of prosecution is simply not reasonable.

Doe worked as a government cooperative during a law enforcement investigation, helping to orchestrate two controlled buys of cocaine. He wore a body wire and was monitored during his interaction with the suspects under investigation. Moreover, the detective who supervised both controlled buys testified that Doe had not deviated from the scope of his role in these buys nor engaged in otherwise illicit conduct with respect to the events in question or proceeds thereof to support a theory upon which Doe could be prosecuted. Doe did indicate before the magistrate judge that there were pending and unspecified federal indictments against him but he did not claim that they were related to the controlled buys in question. In sum, no evidence exists in the record which might call into question the agency relationship between Doe and law enforcement during the relevant time frame.

## IV. Conclusion.

For the foregoing reasons, I find that the information sought by the government of this grand jury witness is not of an incriminating nature. The record indicates that Doe acted as a government cooperative during two controlled drug purchases. His actions were supervised by law enforcement officials and there is no evidence that he strayed from the scope of his prescribed activities. I further find that Doe has not met his burden of otherwise proving that this facially non-incriminating activity was, in fact, incriminating.

I also find, however, that even had the witness substantiated his fear of incrimination, the fear itself is too remote and fanciful to qualify under the law. The chance of prosecution in Doe's case is simply too improbable to justify his invocation of the Fifth Amendment.

Accordingly, the order of the magistrate judge will be set aside and the witness directed to answer the referenced questions before the grand jury.